UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF KENTUCKY
PIKEVILLE DIVISION


IN RE:

BLACK DIAMOND MINING COMPANY, LLC, et al.

DEBTORS                                          CASE NO. 08-70066 through
                                                 08-70067 and 08-70069
                                                 through 08-70073

                                                 Jointly Administered



BLACK DIAMOND MINING COMPANY, LLC;
THE CIT GROUP/COMMERCIAL SERVICES, INC.          PLAINTIFFS


VS.                                              ADV. NO. 08-7005


HAZARD COAL SALES, LLC; THOROUGHBRED
COAL COMPANY, LLC; KIVA COAL SALES, LLC          DEFENDANTS


**MEMORANDUM OPINION**

This matter is before the court to resolve disputes concerning interests and rights in certain coal produced by the Debtor, and in the proceeds of the sale of that coal.  Each of the Plaintiffs has filed a Motion for Summary Judgment, as have the Defendants.  This court has jurisdiction of this matter pursuant to Judicial Code section 1334(b); the Plaintiffs have alleged that it is a core proceeding pursuant to Judicial Code section 157(b)(2).

1.  Procedural history

This proceeding was initiated by the filing of a Complaint for Declaratory Judgment to Determine Interest in Property by Plaintiff Black Diamond Mining Company, LLC ("BDM" or "the Debtor") on April 16,

1

2008.  None of the other joint debtors in this case are involved in this proceeding.  BDM filed an Amended Complaint the next day to correct certain technical deficiencies.  The Defendants filed their Answer and Affirmative Defenses to Amended Complaint for Declaratory Judgment to Determine Interest in Property and Counterclaim of Hazard Coal Sales, LLC and Thoroughbred Coal Company, LLC (Doc. #8) on June 2, 2008.

    A Second Amended Complaint (Doc. #24) was filed by BDM and The CIT Group/Commercial Service, Inc. ("CMS") (collectively, "the Plaintiffs") on July 21, 2008.  The Defendants filed their Answer and Affirmative Defenses to Second Amended Complaint and Counterclaim of Hazard Coal Sales, LLC and Thoroughbred Coal Company, LLC (Doc. #28) on August 8, 2008.  BDM filed a Reply to Counterclaim (Doc. #30) on August 28, 2008; CMS filed a Reply to Counterclaim (Doc. #31) on the same date.  The Plaintiffs filed their Third Amended Complaint (Doc. #49) on November 13, 2008; the Defendants filed their Answer and Affirmative Defenses to Third Amended Complaint (Doc. #60) on November 24, 2008.

    Defendant Kiva Coal Sales, LLC ("Kiva") filed its Motion for Summary Judgment (Doc. #50) on November 13, 2008; BDM filed its Response (Doc. #62) on November 26, 2008; and Kiva filed its Reply (Doc. #65) on December 3, 2008.  The Defendants filed a Motion for Summary Judgment Against Plaintiff, The CIT Group/Commercial Services, Inc. (Doc. #74) on December 9. 2008.  BDM filed a Motion for Partial Summary Judgment (Doc. #77) and CMS filed a Motion for Summary Judgment (Doc. #79) on the same date.  An Order overruling Kiva's Motion for Summary Judgment (Doc. #92) was entered on December 22,

2008.

CMS filed its Response to Defendants' Motion for Summary Judgment (Doc. #98) on January 9, 2009. The Defendants filed their Response In Opposition to (I) Black Diamond Mining Company, LLC's Motion for Partial Summary Judgment, and (II) The CIT Group/Commercial Services, Inc.'s Motion for Summary Judgment (Doc. #99) on the same date.  On January 23, 2009, the Defendants filed their Reply to the CIT Group/Commercial Services, Inc.'s Response to Defendants' Motion for Summary Judgment (Doc. #100).  On the same date, BDM filed a Reply in Support of its Motion for Summary Judgment (Doc. #101) and CMS filed its Reply to Defendants' Response to Motion for Summary Judgment (Doc. #103).  The court conducted a hearing on the various motions for summary judgment on February 12, 2009, and the matter was taken under consideration for decision.

2.   Factual background

As set out by BDM, and supported by references to affidavits, deposition testimony, and other documents in evidence attached to its Motion for Partial Summary Judgment, pertinent facts are as follows:

BDM sold coal to, and in some cases purchased coal from, companies wholly owned by Daniel Tayloe.  These include the Defendants, as well as Riverway Terminals, Inc. (collectively, "the Tayloe Entities").  Initially, BDM bought coal from Kiva and sold coal to the Tayloe Entities.  BDM and the Tayloe Entities would "net out" their respective invoices.  (11/18/08 Tayloe dep. at 31:17-32: 19; Fulkert Aff., Ex. 4, Dep. Ex. 18, Release and Payment Agreement at 1.)[1]

---

[1] Marc A. Fulkert, Esq., attorney with Jones, Day, counsel for the Debtors.

3

In July 2007, the Tayloe Entities entered into an agreement with Black Diamond Resources, LLC ("BDR") and its subsidiaries (including BDM) whereby all of the transactions occurring on or before April 30, 2007 were "netted out," and the Tayloe Entities agreed to pay BDR and its subsidiaries the remaining net amount of $396,747.00. (*Id.*)

By August 2007, BDM was selling its coal primarily to Hazard. (Ex. B., Mullins Aff. at ¶3.)[2] Hazard was required to pay for the coal it purchased as there were no longer any invoices against which it could "net out" its obligation. BDM's sales to Hazard were governed by a series of purchase orders ("the Purchase Orders") under which BDM delivered coal to Hazard at the Riverway Terminal or at BDM's facilities in Floyd County, Kentucky. After delivery, BDM would generate an invoice to Hazard requiring it to pay in full the week following delivery. In September 2007, however, BDM put Hazard on two week payment terms. (Fulkert Aff., Ex. 5, Dep. Ex. 21, 9/10/08 Email at HCS 0189; Fulkert Aff., Ex. 6, 11/19/08 Gaunt Dep. At 56:24-57:8, 59: 16-20.)

Hazard was required to pay The CIT Group/Commercial Services, Inc. ("CMS") for the coal BDM sold to Hazard. Pursuant to the May 11, 2006 Factoring Agreement between BDM and CMS, BDM sold and assigned all of its accounts arising from sales of coal inventory to CMS, including invoices rendered to Hazard (Ex. 2 to Second Amended Complaint at 1.) Hazard became aware of the relationship between BDM and CMS "somewhere in 2006." (Fulkert Aff., Ex. 3, 11/18/08 Tayloe Dep. At 37:18-24.) Hazard made payments directly to CMS for the coal

---

[2] Carl Mullins, Vice President of Quality and Transportation for BDM.

BDM sold to Hazard. (Fulkert Aff., Ex. 6, 11/19/08 Gaunt Dep. At 21:24-22:6, 23:3-15; Fulkert Aff., Ex. 7, 11/19/08 Brandenburg Dep. At 13:15-14:17, 44:3-45:14, Fulkert Aff., Ex. 1, 11/6/08 Sergent Dep. At 48:9-17.)

Hazard was behind on payments after the relationship between BDM and the Tayloe Entities changed in 2007. (Fulkert Aff., Ex. 24, 11/12/08 Tate Dep. at 33:6-12, 71:15-24, 83:21-84:9.) On August 29, 2007, Hazard owed BDM approximately $3,479,924.70 for invoices that were overdue. (Ex. C, Aff. of Joseph Funk ("Funk Aff.") at ¶8.)[3] Before the end of October, the overdue amount was approximately $5,172,595.24. (*Id.* at ¶11.) BDM contacted Defendants to make good on Hazard's receivable, and Tayloe responded that they were trying to raise funds to make the payment (Ex. C, Funk Aff. At ¶7; Fulkert Aff., Ex. 24, 11/12/08 Tate Dep. at 33:6-12.) BDM learned that Tayloe was trying to sell the Riverway Terminal to raise funds. (Fulkert Aff., Ex. 1, 11/6/08 Sergent Dep. at 86:16-24, 87:22-89:9; Fulkert Aff., Ex. 8, Dep. Ex. 27, 10/1/07 Email at 1.)

The Defendants continued to represent that they intended to pay, and from October 26, 2007 to December 17, 2007, BDM delivered and Hazard accepted another 86,449.68 tons of coal. (Fulkert Aff., Ex. 9, Defendants' Responses to BDM's First Set of Requests for Admission at Response No. 2(p. 4).) Pursuant to the Purchase orders, BDM issued 59 invoices to Hazard totaling $4,140,612.52 for the coal and shipping costs ("the Unpaid Invoices")(Second Amended Complaint, Ex. 3.) which Hazard did not pay. Hazard did, however, make a number of payments to

---

[3] Joseph Funk, Senior Financial Analyst for BDM.

CMS between October 26, 2007 and the end of December 2007 for amounts past due on BDM's other deliveries.  During this time period, Tayloe never told BDM that Hazard was withholding payment or that it would not pay the full amount due.  (Fulkert Aff., Ex. 1, 11/6/08 Sergent Dep. At 63:12-22; 74:7-13; 105:2-106:7; Fulkert Aff., Ex. 3, 11/18/08 Tayloe Dep. At 44:3-7.)

After intensifying its efforts to collect from Hazard, BDM finally stopped selling coal to Hazard on January 2, 2008, due to its failure to pay the Unpaid Invoices.  (Ex. B, Mullins Aff. at ¶4; Fulkert Aff., Ex. 3, 11/18/08 Tayloe Dep. At 82:15-17.)  The parties then began operating under an arrangement whereby BDM would ship coal to its own stockpiles at the Riverway Terminal and one of the Tayloe Entities would transload the shipment to BDM's other customers, specifically Constellation Energy.  (Fulkert Aff., Ex. 1, 11/6/09 Sergent Dep. At 187:8-188; Fulkert Aff., Ex. 6, 11/19/08 Gaunt Dep. At 119:22-25.)

On January 25, 2008, Sergent wrote a letter to Tayloe regarding Hazard's debt to BDM.  This letter included the following language:

> As we have previously discussed, Black Diamond Mining Company, LLC needs to understand what actions Hazard Coal Sales, LLC is taking to pay past due amounts owed to Black Diamond.  As of today, Hazard is delinquent on payment of approximately $4.2 million for coal that has been shipped to Hazard by Black Diamond.  As a result of these past due amounts, Black Diamond has ceased shipping coal to Hazard.

(Second Amended Complaint, Ex. 4 at 1.)  Tayloe has conceded that when he received the letter Hazard was "delinquent on payment of approximately $4.2 million for coal that ha[d] been shipped to Hazard by Black Diamond," and "Hazard ha[d] not challenged or disputed the amounts owed to Black Diamond."  (Fulkert Aff., Ex. 3, 11/18/08 Tayloe

Dep. T 100:19-101:5.)  Hazard continued to make payments for amounts past due, even after BDM stopped selling coal to Hazard.  On January 4, 2008, Hazard paid BDM $63,455.94,(Fulkert Aff., Ex. 14, Dep. Ex. 70, 1/4/08 Email at HCS0005; Fulkert Aff., Ex. 3, 11/18/08 Tayloe Dep. At 92:25-93:19; Fulkert Aff., Ex. 6, 11/19/08 Gaunt Dep. at 122:20-123:10.) and on January 10, 2008, Hazard paid BDM $203,934.26 (Fulkert Aff., Ex. 15, Dep. Ex. 72, 1/10/08 Email at HCS0001; Fulkert Aff., Ex. 3, 11/18/08 Tayloe Dep. At 93:20-94:5; Fulkert Aff., Ex. 7, 11/19/08 Brandenburg Dep. At 45:24-46:7.)  Hazard continued to represent that it intended to pay the debt, and was trying to make arrangements to do so.

Although BDM stopped selling coal to Hazard on January 8, 2008, BDM continued to deliver coal to the Riverway Terminal for sale to Constellation.  (Fulkert Aff., Ex. 1, 11/6/08 Sergent Dep. at 187:8-24.)  One of the Tayloe Entities continued to transload this coal onto barges for BDM.  (*Id.*)  In January 2008, approximately 37,587.66 tons of coal were transloaded for sale to BDM's customers other than Hazard.  (Fulkert Aff., Ex. 17, Defendants' Answers to BDM's First Set of Interrogatories at Answer to Interrogatory No. 4 (pp. 10-11).)  Hazard never asserted any ownership rights to any of the coal delivered to the Riverway Terminal to be transloaded for sale to Constellation.

In early February 2008, BDM, Hazard, and TCC entered into a written agreement dated February 2, 2008 ("the February Agreement")(Second Amended Complaint, Ex. 5.)  The February Agreement established that Hazard owed BDM $4,050,493.18; terminated the Purchase Orders (but not the payable Hazard owed) between the parties;

7

established two mechanisms to pay down the $4,050,493.18 balance, i.e., sharing profits TCC expected to receive from the sale of barge coal ("the Barge Coal") it had the right to purchase below market under an agreement with a third party, and having Hazard's affiliate transload coal BDM sold to customers other than Hazard and deducting the cost of those transloading services from the balance owed (*Id.* at §§(1)(b)(I), (1)(b)(ii), (1)©, (2)©.); and established that Hazard could obtain certain amounts of BDM coal each month in 2008 if, and only if, Hazard replaced that coal by blending Barge Coal with such BDM coal. (*Id.* at §(2)(b).)

The February Agreement also contained cross default provisions, one of which established that even if BDM breached the February Agreement, it was entitled to $4,050,493.18. (Second Amended Complaint, Ex. 5 at §(3)(e)("[P]rior to the Full Payment Date, no breach or default by Black Diamond or any of its affiliated companies under this Agreement or any other agreement shall operate to amend, terminate or otherwise modify Section 1 of this Agreement [i.e., the repayment provision] or any other provision of this Agreement otherwise relating to the Barge Agreement.").) The February Agreement further provided that "termination or expiration of this Agreement ...shall not amend, waive or modify HC's obligation to pay the HCS Payable or Black Diamond's right to pursue collection of the HCS Payable." (*Id.* at §(4)(a).)

After the February Agreement was executed CMS declared an event of default under the Factoring Agreement and discontinued making advances to BDM on its invoices. (Fulkert Aff., Ex. 1, 11/6/08 Sergent Dep. At 189:13-190:2.) Because CMS terminated BDM's

financing, BDM was unable to factor an invoice resulting from the sale of Barge Coal on nine barges then located near New Orleans.  TCC was entitled to this coal under the Barge Agreement.  (Fulkert Aff., Ex. 1, 11/6/08 Sergent Dep. At 156:9-15, 157:19-23; Fulkert Aff., Ex. 3, 11/18/08 Tayloe Dep. At 117:12-16, 120:25-121:3.) After Tayloe learned that BDM could not factor the invoice for the sale of the barges, he sold them to Emerald International for a profit, but paid BDM nothing.  (Fulkert Aff., Ex. 3, 11/18/08 Tayloe Dep. at 129:5-130:4.)

On February 14, 2009, counsel for Hazard and TCC sent BDM a letter claiming that BDM had breached the February Agreement, and that it was "void and of no effect."  (Second Amended Complaint, Ex. 6 at 1-2.)  After Tayloe sold the nine barges to Emerald International, he brought almost all of the future barges of Barge Coal to the Riverway Terminal, blended it with other coal, and sold it for a profit.  (Fulkert Aff., Ex. 3, 11/18/08 Tayloe Dep. At 132:3-11, 134:2-20.) BDM was paid nothing from these sales.  (*Id.* at 134:21-21.)  On February 24, 2008, CMS made demand upon Hazard to pay its outstanding balance (Second Amended Complaint, Ex. 7.), but Hazard did not pay either CMS or BDM.

Pursuant to the February Agreement, BDM delivered approximately 26,000 tons of coal to the Riverway Terminal from February 4-13, 2008, to be transloaded onto barges for sale to Constellation.  (Ex. B, Mullins Aff. at ¶6; Fulkert Aff., Ex. 21, Dep. Ex. 75, Riverway Inventory Summary for February 2008 at HCS3349; Fulkert Aff., Ex. 21, Dep. Ex. 76, Daily Incoming Coal Report at HCS3347-48; Fulkert Aff., Ex. 3, 11/18/08 Tayloe Dep. at 146;9-147:7, 149:14-22; Fulkert Aff., Ex. 24, 11/12/08 Tate Dep. at 44;2-6, 46:14-18.)  BDM therefore

9

performed the February Agreement until the day it received Hazard's termination letter, and was ahead of schedule on its obligation to deliver 45,000 tons of coal to the Riverway Terminal in February 2008. Approximately 5,500 tons of BDM's coal for sale to Constellation was transloaded on February 4 and 5, 2008, but no coal was transloaded for BDM after February 5, 2008. (Fulkert Aff., Ex. 21, Dept. Ex. 75, Riverway Inventory Summary for February 2008 at HCS3349.) BDM's inventory at the Riverway Terminal stood at 21,099.67 tons of coal on February 13, 2008 ("the Subject Coal"). (Fulkert Aff., Ex. 22, Dep. Ex. 76, Daily Incoming Coal Report at HCS3347-48; Fulkert Aff., Ex. 3, 11/18/08 Tayloe Dep. At 146:24-147:7, 148:23-149:13.)

Under the terms of the February Agreement, BDM retained ownership of the Subject Coal (Second Amended Complaint, Ex. 5 at §(2)(c)(x) ("the Black Diamond Coal delivered to the Terminal by Black Diamond shall remain the property of Black Diamond or its customer...").) Riverway Terminal's records identified the Subject Coal as BDM's property. (Fulkert Aff., Ex. 21, Dep. Ex. 75, Riverway Inventory Summary for February 2008 at HCS3349 ("Black Diamond In" and "Black Diamond Out").) Tayloe also admitted that BDM's inventory stood at 21,099 tons. (Fulkert Aff., Ex. 3, 11/18/08 Tayloe Dep. At 149: 5-7.) The Defendants never blended the Subject Coal with any other coal. (Fulkert Aff., Ex. 9, Defendants' Responses to BDM's First Set of Requests for Admission at Response No. 8 (p. 5); Fulkert Aff., Ex. 3, 11/18/08 Tayloe Dep. At 152:25-153:2.)

Hazard refused to transload the Subject Coal onto barges for sale

to a customer of BDM. (Ex. D., Aff. Of Ira Genser ("Genser Aff.")[4] at ¶3.) On February 28, 2008, BDM met with Tayloe and others, to request that Defendants release the Subject Coal. (*Id.* at ¶4.) Tayloe stated that Defendants would not release the Subject Coal to BDM or otherwise allow BDM access to Defendants' property to remove the Subject Coal. (*Id.*). BDM, through counsel, made a demand on the Defendants that the Subject Coal be loaded onto the barges for sale to Koch, but that demand was refused. (*Id.* at ¶5.)

On March 3, 2008, BDM filed its Emergency Motion for Enforcement of the Automatic Stay. After considering this motion, the court entered an order on March 5, 2008, authorizing BDM to sell the Subject Coal to Koch, ordering the Defendants to load the Subject Coal for sale, and ordering BDM to hold the sale proceeds in a segregated account. BDM sold the Subject Coal to Koch and is holding the proceeds of $1,660,006.38 in a segregated account. (Ex. D, Genser Aff. At ¶6.)

2.  Discussion

   a.  The summary judgment standard

Federal Rule of Civil Procedure 56©, made applicable in bankruptcy by Bankruptcy Rule 7056, provides that summary judgment is appropriate and "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The Supreme Court has observed that

---

[4] Ira Genser is the Chief Restructuring Officer for BDM.

11

> this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of *material* fact.
> As to materiality, the substantive law will identify which facts are material. Only disputes over facts which might affect the outcome of the suit under governing law will properly preclude the entry of summary judgment.

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-248, 106 S. Ct. 2505, 2510 (1986)(emphasis in original).

The summary judgment standard is set out in *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S. Ct. 2548, 2552-53 (1986):

> [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.

The Sixth Circuit has opined that "[r]ead together, *Liberty Lobby* and *Celotex* stand for the proposition that a party may move for summary judgment asserting that the opposing party will not be able to produce sufficient evidence at trial to withstand a directed verdict motion." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1478 (6th Cir. 1989).

   b.   <u>Breach of contract - BDM</u>

BDM argues that it is entitled to summary judgment on Count I (Breach of Purchase Orders) of the Third Amended Complaint because it has demonstrated the four elements necessary for recovery for breach of contract: existence of a contract; performance by the plaintiff; breach by the defendant; and damages. The Purchase Orders constitute

a contract for the sale of coal, which is governed by the UCC. *See* KRS 355.2-107 and 355.2-301. Under the Purchase Orders, BDM was obligated to deliver coal and Hazard was obligated to pay for it. Except for a $119.34 payment, Hazard never paid for the 86,449.68 tons of coal BDM delivered. In an action for breach of contract, the measure of damages is that sum which will put the injured party in the same position it would have been in had the contract been performed. *Barnett v. Mercy Health Partners-Lourdes, Inc.*, 233 S.W.3d 723, Ky. App. (2007). BDM maintains that it is entitled to summary judgment in the amount of $4,140,493.18, as well as prejudgment interest at 8% per annum.

BDM further maintains that there was no justification for Hazard's withholding payment for the subject coal as it had met all its obligations under the Purchase Orders. BDM further points out that KRS 355.2-609 requires that a party's demand for adequate assurance be in writing, and that it does not allow a buyer to refuse payment for goods it has already received. BDM contends that the only reason Hazard refused to pay was that it was not able to do so. (Fulkert Aff., Ex. 9, Defendants' Responses to BDM's First Set of Requests for Admission at Response No. 6 ("Defendants admit that they did not have $4,140,612.52 . . . of 'cash on hand' between November 1, 2007 and February 18, 2008").) Tayloe also admitted that he would have to use his personal funds to pay off BDM in December 2007. (Fulkert Aff., Ex. 3, 11/18/08 Tayloe Dep. At 63: 17-19.) As set out above, Hazard repeatedly represented that it intended to pay, and that it was looking for ways to so do, but could not.

BDM contends that Hazard and TCC breached the February Agreement

13

in that TCC was required to sell the Barge Coal and share the profits with BDM under the terms of the February Agreement if BDM was unable to factor an invoice.  The Barge Coal was sold, and future barges of coal were brought back to Riverway and sold, but BDM never received any of the proceeds.  Instead, Hazard and TCC attempted to terminate the February Agreement.  BDM argues that this attempted termination of the February Agreement constitutes an anticipatory repudiation of the contract, and allows BDM to bring an action for breach.  Anticipatory repudiation is governed by KRS 355.2-610 which provides:

> When either party repudiates the contract with respect to a performance no yet due the loss of which will substantially impair the value of the contract to the other, the aggrieved party may
> (a) for a commercially reasonable time await performance by the repudiating party; or
> (b) resort to any remedy for breach (KRS 355.2-703 or 355.2-711) even though he has notified the repudiating party that he would await the latter's performance and has urged retraction; and
> (c) in either case suspend his own performance or proceed in accordance with the provisions of this article on the seller's right to identify goods to the contract notwithstanding breach or to salvage unfinished goods (KRS 355.2-704).

As stated by the court in *Upton v. Ginn,* 231 S.W.3d 788, Ky.App. (2007):

> The Official Comment to [KRS 355.2-610] states that 'anticipatory repudiation centers upon an overt communication of intention or an action which renders performance impossible or demonstrates a clear determination not to continue with performance.  U.C.C. § 2-610 (1958). Official Comment 1.  The words or facts alleged to constitute the repudiation must be 'unequivocal.' *Brownsboro Road Restaurant, Inc. v. Jerrico, Inc.*, 674 S.W.2d 40 (Ky.App. 1984).

*Id.* at 791.

Thus, BDM contends, it was entitled to treat the letter from Hazard and TCC declaring the February Agreement "terminated" and

14

"void" as a material breach and to suspend all performance under it. Further, pursuant to the terms of the February Agreement, it was entitled to collect immediately on Hazard's debt. BDM also contends that because Hazard and TCC breached the February Agreement, they have no claim against BDM for alleged failure to supply coal in 2008 and 2009. *See W. Ky. Coal Co. v. Nourse*, 320 S.W.2d 311, 315, Ky. (1959) ("[A] party who commits the first breach of a contract is deprived of the right to complain of a subsequent breach by the other party.").

The court agrees with BDM that Hazard and TCC breached the February Agreement, and that it has demonstrated that it should have summary judgment on Count I of its Third Amended Complaint.

    c.    <u>Recovery of money owed - BDM</u>

BDM seeks summary judgment on Counts II, III, V and IX of its Third Amended Complaint and asks the court to grant summary judgment against Hazard and TCC on Counts II and III of their Counterclaim. BDM argues that Hazard received and accepted the subject coal, and the February Agreement memorialized the existence and the amount of Hazard's debt to BDM. Accordingly, BDM maintains, it is entitled to summary judgment on Count II of its Third Amended Complaint for $4,040,731.16 plus prejudgment interest at eight percent per annum. In this regard, BDM further contends that it is entitled to judgment on its claim for turnover (Count III) in that the debt Hazard owes exists, is matured, and payable on demand. 11 U.S.C. § 542(b). BDM states that an outstanding account receivable is property of the estate and subject to a claim for turnover. *See In re Nuckols and Assocs. Sec., Inc.*, 109 B.R. 294, 296 (Bankr. S.D. Ohio 1989) ("[C]ertain debts owed to the estate are the proper subject of a

15

turnover proceeding[.]") The court agrees that BDM is entitled to a judgment ordering Hazard to turn over $4,040,731.16 plus prejudgment interest at eight percent per annum.

  e. <u>Other claims - BDM</u>

BDM has made claims in its Third Amended Complaint under theories of liability for breach of contract (Count IX), unjust enrichment (Count V), and against Hazard and TCC as to breach of the settlement agreement (Count II of the their Counterclaim), and interest in collateral (Count III of the Counterclaim).  In view of the rulings herein, the court believes that BDM is entitled to summary judgment on these claims as well.  BDM has asserted that it should have a declaratory judgment that it owned the Subject Coal and is entitled to the proceeds from that coal (Count VII) and for conversion (Count VIII).  The court believes that BDM is entitled summary judgment on Counts VII and VIII, and that it should have summary judgment against Hazard and TCC on Count I of their Counterclaim which also sought a declaratory judgment on the issue of entitlement to proceeds.

Finally, BDM has asserted that it is entitled to summary judgment against Hazard on Count IV of its Counterclaim which seeks set-off or recoupment of purported damages from the alleged breach of the February Agreement.  Again, in view of the rulings herein, the court believes that BDM is entitled to summary judgment on this issue.

  f. <u>CMS's entitlement to unpaid accounts receivable</u>

The court has determined that Hazard breached the February Agreement, and is liable to BDM in the amount of $4,040,731.16 . Under their Factoring Agreement, BDM assigned to CMS the right to receive payment on valid invoices totaling that amount.  As pointed

16

out by CMS, Hazard's sole defense to this claim is that its debt is subject to offset by damages it claims to have incurred from BDM's alleged breach of the February Agreement. The court has ruled that this defense is unavailing, as Hazard is the party that breached the February Agreement. CMS contends, therefore, that it is entitled to $1,660,006.38 now held as proceeds from BDM's sale of the Subject Coal to Koch Carbon, LLC. The court agrees as Hazard has no claim on any of these proceeds. CMS's Motion for Summary should be sustained.

In consideration of all of the foregoing, it is the opinion of this court that BDM should have summary judgment on Counts I, II, III, V, VII, VIII, and IX of its Third Amended Complaint, and against Hazard and TCC on Counts I-IV of their Counterclaim. It is further the opinion of this court that CMS's Motion for Summary Judgment should be sustained, and that the Defendants' Motion for Summary Judgment should be overruled. Counsel for plaintiffs are directed to submit appropriate orders/judgments in conformity with this opinion.

Copies to:

Kara Read Marino, Esq.
Matthew A. Kairis, Esq. (service by U.S. mail)
Michael J. Gartland, Esq.
Robert J. Brown, Esq.

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~
**The affixing of this Court's electronic seal below is proof this document has been signed by the Judge and electronically entered by the Clerk in the official record of this case.**



**Signed By:**
*William S. Howard*
**Bankruptcy Judge
Dated: Thursday, June 11, 2009
(wsh)**